## CARTER *v.* THE STATE.

1. Under the evidence submitted by the defendant, tending to sustain the challenge to a juror upon the ground of bias and prejudice, the objection should have been sustained.

2. Inasmuch as a new trial is granted under the ruling made in the first division hereof, it is unnecessary to consider the grounds based upon the alleged disqualification of still other jurors, as this question will probably not arise on the next trial.

3. Evidence as to the finding of a certain cartridge shell near the scene of the homicide was properly admitted.

No. 2951. SEPTEMBER 30, 1922.

Indictment for murder. Before Judge Highsmith. Pierce superior court. November 4, 1921.

*James R. Thomas,* for plaintiff in error.

*George M. Napier, attorney-general, A. B. Spence, solicitor-general,* and *Seward M. Smith, assistant attorney-general,* and *S. F. Memory,* contra.

PER CURIAM. Major Carter was indicted for the murder of John W. Roberson; it being charged that he did unlawfully and with malice aforethought kill the deceased by shooting him. The jury trying the case returned a verdict of guilty. The defendant made a motion for a new trial, which was overruled, and to this judgment he excepted.

1. The original motion for a new trial contains the general grounds. The first ground of the amendment to the motion excepts to the ruling of the court adjudging one E. L. Darling to be a competent juror. To show the incompetency of the juror the movant sets forth the testimony of several witnesses as to occurrences which took place shortly after the accused was arrested, and when he was in the charge of the sheriff and the deputies. Certain witnesses testified as to unseemly behavior upon the part of the juror, to hostile demonstrations toward the accused, violent language used in reference to him, exhibition of intense passion, and the use of threatening language. S. B. Jenkins, a witness introduced by the defendant, testified: " I didn't see him [Darling] making any efforts to get to Mage Carter. His boy had his arms back this way [witness illustrating], Darling's boy, and he had him back this way holding him [illustrating], and Darling was talking. I couldn't understand exactly what he was saying. He was crying and rearing, and said, ' Let me get to him.' [That] is about the only thing I understood. I don't know that he said that he couldn't stand to let a fellow like that kill his friend. I don't think that I heard him make the remark that he ought to be taken out and hung. He was crying and making an effort as if to get to him, tried to get loose; and Mr. Lonnie Strickland walked up about that time, and Lonnie, I think, he kind of discouraged his efforts. I did not hear any statement there by Mr. Darling, or anybody else, in reference to taking Mage Carter out there and hanging him. I couldn't tell the exact language Mr. Darling used, in reference to him saying that he couldn't stand to see a fellow like that take the life of his friend; but he was

talking very fast, and his son had his arm back this way [illustra-ting]. His son soon took him through both arms, and Mr. Lonnie Strickland walked up there, and I told him to turn him loose. I didn't believe there was any harm in him; but still he was cry-ing, and it looked like he wanted to get to the prisoner." On cross-examination he testified that he did not remember just what the witness Darling said. "I don't remember the exact language used by Darling. He was talking a great deal. He was about 30 or 35 feet from the prisoner. While he did not call Carter's name, I judged from his conversation that his talk was in reference to Mage Carter. . . I do not remember the exact words, but Darling was crazy to get to somebody; he was flinging a fit, it looked like to me, and I said, 'Turn him loose,' and they turned him loose in about a moment. I knew there was not much harm in Lee [Darling]. The train was then coming. . . I went in the afternoon before where Darling [the juror] was embalming him [the deceased]. He was a friend of mine. Darling said, 'They have killed one of my best friends,' and he said, 'It is a pity to kill a man in this way.'" There was evidence tending to support that of the witness Jenkins, showing that the juror challenged entertained strong and even bitter feelings against the accused.

The juror himself testified in reference to the incident. He con-tradicted in part the evidence of the witnesses introduced by the accused, but admitted that on the morning after the arrest of the defendant he said, in regard to the prisoner: "I want to see the man that killed my best friend, so that the next time I see him I will know him. I had not been acquainted with him before. One of the deputies was on Mage's [the accused] left, or on my right. I was about anywhere from ten to twelve feet from the deputy. I kept step with the deputy, and I kept looking at the accused murderer, because I wanted to see so I would know him the next time. I was very much wrought up at the death of one of my best friends, and I kept my distance. I knew what was right. I did not propose to do anything rash; but I kept looking at the prisoner every chance I could get; and my son — he is very emotional, the same as his daddy, — he saw me walking along keeping up with him, and I was on a line with the deputy; and my son came up behind me and he grabbed my arms; and I

was several feet in advance of everybody · else on the deputy's left; and he came up and he said, 'Just be quiet, father,' and I said, 'I am quiet; you just let me alone.' And he grabbed both my arms back of me in that position [illustrating], and I was so nervous and unstrung that for a few seconds I couldn't say anything to him on account of my emotions; but when I did I says, 'Now I am all right. I am not going to do anything. I want justice done;' and we got close to the depot, and Mr. Lonnie Strickland came up, and I am sure W. E. Davis, and it seems to me like Mr. Meeks was close by; and I wasn't certain without asking those gentlemen; and they carried the prisoner into the colored waiting-room, and I told them, 'I can.' I said, 'That is my privilege, and I don't want a thing wrong done with him. I want him protected.' I made that remark more than once; and finally my boy turned me loose, and I walked to the window of the negro waiting-room and looked in, and kept my eye on that negro and Mage Carter every minute I could; and when they went to the car I followed them at a reasonable distance — don't know, probably anywhere — I might have been anywhere from fifteen to twenty-five or thirty feet from him at the time." The juror also denied that he tried to set up mob violence. He further swore that he knew the sheriff, the decedent, was dead the day before; that he did not know who killed him, that he only heard reports; that he had heard that Mage Carter did the shooting, but was not positive; that he was a friend of the decedent; that he did not know what he did at the depot that morning; that he was very emotional; that he · did not "have it in for the fellow that killed Mr. Roberson, — not legally;" that his mind was absolutely, perfectly impartial; that he had nothing against the fellow in the world, that he had no feeling against him; that he "only wanted justice."

The judge held the juror competent and he was put upon the prisoner. After considering the entire evidence, this court is of the opinion that this evidence showed such bias and prejudice against the prisoner, and such intense feeling against him, that the court below should have sustained the challenge to the juror based upon bias and prejudice. The dead sheriff was the friend of the juror, and the juror's own conduct shows that the friendship between him and the deceased was so close and binding that he was overcome at the sight of the prisoner and the recollection

of the deed with the commission of which he stood charged. He shed tears, and his agitation and indignation were so violent that his own son, who was with him, felt it necessary to put his arms about him and restrain him. Though the juror may have thought that he was free from prejudice and bias, and may have conscientiously answered the voir dire questions, this court is of the opinion, from the entire evidence, that he was not a juror " superior to all exceptions," and that the challenge should have been sustained.

In addition to the above, the evidence showed that the homicide occurred on August 23, 1921, and the accused was arrested the following day and carried to Jesup and then to Savannah; and the indictment was returned September 12, 1921, and on the following day the accused was tried and convicted.

2, 3. The rulings in headnotes 2 and 3 require no elaboration.

*Judgment reversed. All the Justices concur, except*

BECK, P. J., dissenting. Nothing to the contrary appearing, we assume that the juror so answered the voir dire questions as to qualify as a juror. The evidence as to prejudice and bias on the part of the juror was conflicting; and the court, acting as a trior, having held the juror competent, this court can not pronounce it error. Penal Code, § 1001, and authorities cited under catchword " Trior " in the general note. *Turner* v. *State,* 114 *Ga.* 421 (40 S. E. 308), and authorities there cited.